# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**LISA C. NICOSIA,**

$\qquad$ **Plaintiff,**

-vs-$\qquad\qquad\qquad\qquad\qquad$ **Case No.  6:05-cv-913-Orl-DAB**

**COMMISSIONER OF SOCIAL
SECURITY,**

$\qquad$ **Defendant.**

_____

## MEMORANDUM OPINION & ORDER

The Plaintiff brings this action pursuant to the Social Security Act (the Act), as amended, Title 42 United States Code Section 405(g), to obtain judicial review of a final decision of the Commissioner of the Social Security Administration (the Commissioner) denying her claim for Disability Insurance Benefits (DIB) benefits under the Act.

The record has been reviewed, including a transcript of the proceedings before the Administrative Law Judge (ALJ), the exhibits filed and the administrative record, and the pleadings and memoranda submitted by the parties in this case.  Oral argument has not been requested.

For the reasons that follow, the decision of the Commissioner is **AFFIRMED.**

## I. BACKGROUND

### A.    Procedural History

Plaintiff filed for disability benefits on May 2, 2002. R. 53.  She alleged an onset of disability on April 26, 2002, due to systemic lupus erythematosus.  R. 53, 57.  Her application was denied initially and upon reconsideration.  R. 36, 42.  Plaintiff requested a hearing, which was held on

September 20, 2004, before Administrative Law Judge Philemina Jones (hereinafter referred to as "ALJ"). R. 586-616. In a decision dated January 28, 2005, the ALJ found Plaintiff not disabled as defined under the Act through the date of her decision. R. 17-28. Plaintiff timely filed a Request for Review of the ALJ's decision. R. 16. The Appeals Council denied Plaintiff's request on April 18, 2005. R. 5. Plaintiff filed this action for judicial review on June 17, 2005. Doc. No. 1.

### B.  Medical History and Findings Summary

Plaintiff was forty-four years old on the date of her hearing and was almost forty-two years old as of April 26, 2002, her alleged onset date when she stopped working as a law office personnel manager. R. 64. Plaintiff had a high school education and had attended some college. R. 63. Her past relevant work included positions as support staff in law offices.

Plaintiff's medical history is set forth in detail in the ALJ's decision. By way of summary, Plaintiff complained of systemic lupus, heart palpitations, depression, headaches. R. 53, 57, 591. After reviewing Plaintiff's medical records and Plaintiff's testimony, the ALJ found that Plaintiff suffered from systemic lupus, organic and affective disorders and hypertension, which were "severe" medically determinable impairments, but were not impairments severe enough to meet or medically equal one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4. R. 23-24. The ALJ determined that Plaintiff retained the residual functional capacity (RFC) to perform sedentary work, as she could lift ten pounds occasionally and less than 10 pounds frequently, stand and/or walk at least 2 hours and sit six hours in an eight-hour workday. R. 25. In making this determination, the ALJ found that Plaintiff's allegations regarding the severity, frequency, and duration of pain were exaggerated, when reviewed in conjunction with the objective evidence. R. 24.

Based upon Plaintiff's RFC, the ALJ determined that she could not perform past relevant work.  R. 25.  Considering Plaintiff's RFC and the testimony of the VE, the ALJ concluded that Plaintiff could perform work existing in significant numbers in the national economy.  R. 25. Accordingly, the ALJ determined that Plaintiff was not under a disability, as defined in the Act, at any time through the date of the decision.  R. 27.

Plaintiff now asserts that the ALJ erred by improperly applying the pain standard to Plaintiff's subjective complaints, given the evidence of record.  She also argues that the ALJ erred in evaluating her credibility.  For the reasons that follow, the decision of the Commissioner is **AFFIRMED**.

## II.  STANDARD OF REVIEW

The scope of this Court's review is limited to determining whether the ALJ applied the correct legal standards, *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988), and whether the findings are supported by substantial evidence, *Richardson v. Perales*, 402 U.S. 389, 390 (1971).  The Commissioner's findings of fact are conclusive if supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is more than a scintilla – *i.e.,* the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.  *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995), *citing Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) and *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

"If the Commissioner's decision is supported by substantial evidence, this Court must affirm, even if the proof preponderates against it." *Phillips v. Barnhart*, 357 F.3d 1232, 1240 n. 8 (11th Cir. 2004).  "We may not decide facts anew, reweigh the evidence, or substitute our judgment for that of the [Commissioner.]" *Id.* (internal quotation and citation omitted). *Dyer v. Barnhart*, 395 F.3d 1206,

1210 (11ᵗʰ Cir. 2005).  The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.  *Foote*, 67 F.3d at 1560; *accord, Lowery v. Sullivan*, 979 F.2d 835, 837 (11ᵗʰ Cir. 1992) (court must scrutinize the entire record to determine reasonableness of factual findings).

### III. ANALYSIS

#### A.    Pain and credibility.

Plaintiff asserts that the ALJ erred in evaluating her pain, fatigue, and other symptoms due to her cardiac condition, lupus, and joint pain, as evidenced by several hospitalizations.  She also argues that the ALJ erred by finding her subjective statements regarding the severity, frequency, and duration of pain to be exaggerated.  *See* R. 24.  She contends that the specific notes in the record support the credibility of her complaints and that the ALJ erred in ignoring this evidence.  The Commissioner responds that Plaintiff was documented to have participated in an array of activities not associated with disability, such as travel to California, taking a cruise, cleaning her home, preparing meals, caring for her children, and attending all of their soccer games, which are inconsistent with her claimed disability.

Pain is a non-exertional impairment.  *Foote v. Chater*, 67 F.3d 1553, 1559 (11ᵗʰ Cir. 1995).  The ALJ must consider all of a claimant's statements about his symptoms, including pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence.  20 C.F.R. § 404.1528.  In determining whether the medical signs and laboratory findings show medical impairments which reasonably could be expected to produce the pain alleged, the ALJ must apply the Eleventh Circuit's three-part "pain standard":

The pain standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.

*Foote*, 67 F.3d at 1560, *quoting Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991). Pain alone can be disabling, even when its existence is unsupported by objective evidence, *Marbury v. Sullivan*, 957 F.2d 837, 839 (11th Cir. 1992), although an individual's statement as to pain is not, by itself, conclusive of disability. 42 U.S.C. § 423(d)(5)(A).

In this case, the ALJ specifically referred to the Eleventh Circuit's pain standard for evaluating subjective complaints, as well as citing the applicable regulations and Social Security Ruling ("SSR") 96-7p. R. 24. (citing *Brown v. Sullivan*, 921 F.2d 1233 (11th Cir. 1991) and *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991). The ALJ complied with those standards.

Having concluded that she had to make a credibility determination of Plaintiff's subjective complaints, the ALJ stated with a great deal of specificity, immediately before discussing Plaintiff's RFC:

The claimant essentially testified to being very limited in the ability to perform personal care and household chores as a result of her impairments. She testified that she does very little around the house and receives help with all activities including personal care from family members. However, the claimant also testified that she cooks and cares for her two children ages 10 and 13. She also attends their soccer games. She has also gone on a three to four day cruise, walks the dog, and has traveled to California, which is inconsistent with her allegations of debilitating pain and limitations.

The claimant testified that she has a lot of joint pain but does not take pain medication because it makes the pain worse. She testified that she has numbness in the right leg and that her legs give out. She broke her foot when her leg gave out and now tries not to go out. She testified that she has pain in her hands and fingers and that they freeze up. She testified that she has extreme heart palpitations when under a lot of stress or when bending. She has had problems with her vision due to steroid use and it's getting worse. She has problems remembering more than one thing at a time. Her

immune system is very low and she is not supposed to be around anyone who is ill. She has fatigue and headaches and her blood levels are up constantly.  The claimant testified that she has flare-ups of joint pain twice a week lasting several days.

The undersigned finds that the claimant's statement regarding severity, frequency, and duration of pain is exaggerated, when reviewed in conjunction with the objective evidence.  Therefore, the undersigned finds that the allegation of the inability to work because of the subjective complaints is not credible.

The claimant has multiple complaints including pain, numbness, nerve damage, legs giving out, fatigue, problems with vision, low immune system and headaches but after her stroke in February 2002 her neurological examination was normal.  The claimant's motor examination was 5 of 5 in all four extremities.  The medical evidence and current physical examinations show no motor deficits and a symmetric sensory examination.  In office notes from Dr. Jose L. Santini the claimant has not had any overt manifestations of renal involvement.  She reports some episodes of palpitations but this improves with medication (Exhibit 27F).  The claimant testified to her legs giving out but no such complaints are noted in treatment records and in fact the claimant is noted to ambulate well (Exhibit 26F).

As for vision problems, the claimant testified that she only needs glasses for reading. Ophthalmology records show the claimant complains of intermittent blurring.  Other than needing corrective lenses there are no noted visual impairments or problems (Exhibit 11F).

R. 24-25.

Where an ALJ decides not to credit a claimant's testimony about pain, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding. *Jones v. Dep't of Health and Human Servs.*, 941 F.2d 1529, 1532 (11th Cir. 1991) (articulated reasons must be based on substantial evidence).  A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record.  *Foote*, 67 F.3d at 1561-62; *Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988).

Plaintiff contends that the ALJ inaccurately assessed certain aspects of Plaintiff's condition based on the medical evidence of record.  First, Plaintiff argues that the ALJ's finding that Plaintiff's

cardiac "condition continued to remain stable for a number of years through her last follow-up of record on May 1, 2001 (Exhibit 22F/4-8)" was erroneous.  R. 22.  The ALJ's decision correctly described Plaintiff's stable cardiac condition prior to November 2001, when her symptoms of lupus first arose, and prior to February 2002, when she was first diagnosed with lupus.  On April 2, 2002, Dr. Dumbacher noted that Plaintiff had no episode of SVT for three years.  R. 361.

The ALJ went on to specifically mention Plaintiff's July 2002 Emergency Room visit for chest pain.  *See* R. 22.  Plaintiff was admitted to the hospital on two additional occasions during 2002 for chest pains, during the time that she was first diagnosed with lupus and her medications were being adjusted.  Plaintiff was admitted to Florida Hospital in March 2002 for SVT symptoms when she became upset with her kids and was under "extreme stress and anxiety."  R. 294.  In May 2002, Plaintiff was seen at South Seminole Hospital Emergency Room for symptoms of SVT, but she preferred not to be admitted (R. 184) and left after two hours there.  R. 188.  Plaintiff did mention having palpitations to her family care physician, Dr. Dumbacher, in April 2002, but these were described as "short-lived." R. 358.  She also mentioned them to Dr. Gousse, who noted Plaintiff had "occasional tachycardia."  R. 550.

However, Plaintiff's condition stabilized on medication. R. 195 ("Tachycardia controlled with Cartia.").  Prior to Plaintiff's November 2001 hospitalization that eventually led to her lupus diagnosis and new medications, her only medical problem was palpitations, which were controlled with medication and were the result of stress.  R. 250, 454.  In April 2002, two months after Plaintiff started seeing Dr. Richards at Shands Hospital Lupus Research Center, he noted that Plaintiff was placed on channel blockers to help with the SVT.  R. 243.  In October 2002, Dr. Dumbacher noted that since Plaintiff had begun on Toprol she had had no further episodes of palpitations.  R. 344.  Dr.

Richards noted in January 2003 that Plaintiff had problems with SVT in the past, but that they had been better controlled since she was started on Toprol. R. 241. Plaintiff listed Cartia and Toprol as her regular medications by November 2002. R. 240. From October 2002 to February 2003, Plaintiff has only a single episode of SVT that lasted three minutes and resolved. R. 340. As the Commissioner points out, Dr. Santini, one of Plaintiff's treating physician, opined that as of July 2004 that her "palpitations [had] improved with current medications." R. 568.

Second, Plaintiff contends that the ALJ erred in failing to specifically mention three other hospital[1] admissions of Plaintiff's: to Orlando Regional Hospital in May 2003 for right arm numbness, "fogginess," and garbled speech (R. 409); to Florida Hospital in July 2003 for excessive menstruation and endometrial ablation (R. 471); and to South Seminole Hospital in September 2003 for a swollen ear (R. 505).

It is undisputed that Plaintiff did make additional visits to the Emergency Room of hospitals, but they were for conditions that were either not long-term, controlled by medications, or not even mentioned by Plaintiff as impairments. R. 591, 594-96. Plaintiff's admission for a swollen ear in September 2003 followed being bitten by a lot of mosquitos several days before; she was diagnosed with cellulitis of the ear, possibly related to her lupus, and released two hours later with anitbiotics; there is no further mention of an ongoing ear problem in the record. R. 505, 507, 510, 512.

Plaintiff's gynecological problems pre-existed her lupus diagnosis, and no doctor opined that the her gynecological problems were related to lupus or that they were disabling or long-term. *See, e.g.,* R. 344 (Plaintiff had had no menstrual cycle since June of 2002, before that none since December

---

[1] Plaintiff also cites as an "admission" to Shands Hospital what was actually a "return patient evaluation" in January 2003 in the Autoimmune Disease Center where Plaintiff was regularly seen (typically at the Lupus Research Center). R. 241.

2001); R. 464 (October 2003 – doctor performed endometrial ablation earlier in same year on Plaintiff); *see also* R. 461-66 (October 2003 – ovarian cyst); R. 478 (November 2003 – abdominal pain).  Plaintiff underwent endometrial ablation, and other options including hysterectomy were discussed, but Plaintiff declined.  R. 474.

Plaintiff's condition on admission to Orlando Regional Hospital in May 2003 was diagnosed as a left transient ischemic attack, similar to a left cerebral transient ischemic attack she had experienced in February 2002.  R. 405.  Dr. Hoffen in the Emergency Department opined that if no significant stenosis or vessel abnormality for found on the angiography, then there was no further recommendation; Plaintiff was already on a complex regimen for SLE and seeing several treating specialists he listed.  R. 405.  Dr. Hoffen told Plaintiff to follow up with Dr. Oppenheim, her neurologist during the hospital visit in May 2003.  R. 405.  However, despite repeated discussions with Dr. Gousse, her hematologist, recommending that she see her neurologist, Dr. Oppenheim, regarding the ischemic attack issues, Plaintiff failed to make an appointment to see him for ten months.  R. 560, 557, 551.  Plaintiff's lack of diligence in making an appointment to see Dr. Oppenheim belies the severity of her complaints regarding a chronic or debilitating TIA condition.

Plaintiff testified at the hearing that "her blood levels are off constantly" and if her blood levels are too low, then she is in the "stroke zone."  R. 595-96.  However, the most current records from her treating hematologist, Dr. Gousse, reported she has "occasional dizziness and headache" and no neurological deficits; she was to call him if she had "any significant headache" and there was no record of such complaints in Dr. Gousse's notes.  R. 547 (July 2004).  Other records from 2004 indicate that her headaches were "mild" and tachycardia "occasional."  R. 550 (May 2004).

As the Commissioner appropriately argues, while Plaintiff had complained of various limitations when she was admitted for her various hospitalizations, these complaints had been addressed prior to discharge and had not remained at the same degree of limitation.   The Commissioner also argues that Plaintiff's citations are to admission records that show her at the most extreme limitation point, but the ALJ's observations of Plaintiff's typical state are more representative because Plaintiff's pain levels are not constantly at the highest level, but brief exacerbations in an otherwise routine lifestyle and her condition at discharge was always such that her treating physicians did not impose any functional limitations on her.  The Commissioner points to the ALJ's reliance on Plaintiff's testimony that she went on a cruise, cared for her home and children, and attended soccer games to show that she is not in a disabled condition.

Plaintiff attempts to qualify the activities in which she participated, arguing that she did them with difficulty or adverse consequences.  Plaintiff contends that the ALJ misstated her activities incompletely and inaccurately, compared to the record as a whole.  Plaintiff contends that her ADL Questionnaire is uncontroverted regarding her decreased ability to prepare meals because of pain in her joints and her need for assistance (R. 81-83, 606), that attendance at her children's soccer games fatigued her (R. 81-83), and she injured her knee on her anniversary cruise (R. 431).  Plaintiff also argues that her dog walking has been very limited, merely letting the dog out in the front yard at 4:00 a.m., when she fell in the process (R. 344; 611).  She further contends that trip to California was to attend her uncle's funeral (R. 611) resulted in two episodes of SVT while traveling and a doctor visit for medication. R. 344.  Plaintiff also points to her complaints to Dr. Gousse of fatigue in March to May of 2004.  *See* R. 534 (feeling "very tired"); R. 551 ("severe fatigue"); R. 550 (fatigue and neck pain).

-10-

Plaintiff contends that the ALJ erred in failing to consider the records that substantiate her subjective allegations of joint pain, fatigue and weakness, by limiting her decision to a narrow two-month period (May to July[2] 2003) of rheumatological records that indicated she was "doing well" or that her disease appeared to be "well-controlled."  R. 23.  Plaintiff argues that substantial evidence in the record indicates her disease is not well controlled and her pain has not decreased.  The ALJ determined that "[T]he claimant has persistent complaints of pain in muscles and joints but lupus is noted as fairly well controlled and has been since December 2002 and her steroid dosage was progressively decreased . . . As the claimant's steroids decreased so did her pain as in a report of July 14, 2004 she reported fairly mild and generalized pain with occasional exacerbation."  R. 23.  Substantial evidence supports the ALJ's decision.

Although Plaintiff points to her various complaints to Dr. Gousse (R. 562) of shooting headaches in June 2003; of chronic numbness in her feet in August 2003 (R. 561); a four-day headache with nausea in December 2003 (R. 557), by May to July 2004, Dr. Gousse described Plaintiff's headaches as "occasional" and "mild."  R. 547, 550.  More importantly, records from Dr. Buchoff, Plaintiff's treating rheumatologist, from July 2003 to July 2004 consistently indicate Plaintiff's joint pain[3] was "mild" or "moderate" and "generalized with occasional exacerbation" and her lupus was "fairly well controlled."  R. 397, 533-34, 536.  Dr. Santini, her treating nephrologist, described her condition in November 2002 as not having "any overt evidence" of lupus disease.  R.

---

[2]The ALJ cited to Exhibits 20F and 25F, and probably intended to cite reports from May to July 2004, the most current medical reports in the record at the time of the hearing (September 2004) and the decision (January 28, 2005), which would make far more sense to rely upon than records from two months in 2003.

[3]Plaintiff testified at the September 2004 hearing that she "has a lot of joint pain" but tries not to take the pain pills for it because it makes her fatigue worse.  R. 594.

236. In January 2003, Dr. Richards of Shands reported Plaintiff "presently has little evidence of joint inflammation" and could continue to taper steroids. R. 242.

These reports are in sharp contrast to notes of prior examinations in 2002, when Dr. Buchoff described Plaintiff's SLE as active and her pain as increased, "worse in wrists and neck," when her Prednisone dosage was reduced[4] as the dosage of another medication, Methotrexate, was increased. R. 398-401.  By mid-2003, not only did Dr. Buchoff not impose any restrictions, he prescribed Plaintiff weight bearing exercises, including walking or using a treadmill for her condition. R. 535, 537 (October 2003).  Despite the fact that Dr. Richards, the Shands Lupus Center specialist, told Plaintiff that she had a significant amount of depressive symptoms, guilt, and anger, and urged her to seriously consider treatment because depression could be playing a "significant part in worsening of her symptoms," (R. 242) Plaintiff waited six months, from January 2003 to June 2003, before she began treatment at Psychiatric Consultants for depression. R. 581.

Plaintiff also stated in a SSA questionnaire that she rarely goes out in public (R. 91) and she cannot work because her immune system is low and "people come into work sick all the time."  R. 105, 595.  She also cites to her complaints of fatigue to her physicians.  *See* R. 534, 551, 550. However, Plaintiff's decision to take a cruise and travel to California directly contradict Plaintiff's statements of disabling limitations from fatigue and a low immune system.  The ALJ asked Plaintiff directly about the three-day cruise to the Bahamas and Plaintiff stated that her husband had "already paid for it."  R. 610.  When the ALJ sought an explanation from Plaintiff on this statement, pointing out that Plaintiff alleged onset of disability since April 2002, but went on the anniversary cruise a year

---

[4]Plaintiff could not tolerate doses of Prednisone less than 30 mg, but might be able to "once the Methotrexate starts working."  R. 244 (April 2002).  Plaintiff was also told when she was diagnosed with lupus that certain medications would take three to four months to begin working.  R. 365.

later, in March 2003, Plaintiff did not deny the timing but merely stated, "I did not say, hey, let's go on this cruise. He had planned it and paid for it to go away. . . And it turned out to be a pain."  R. 611. Dr. Dumbacher's records indicate that Plaintiff planned a trip to California at least by her office visit of October 1, 2002 and planned to see "her old cardiologist when in California next week" and mentions nothing about a funeral.  R. 347.

The ALJ offered very specific reasons for discrediting Plaintiff's subjective complaints, including inconsistencies between her reports and the examination findings and physician findings and recommendations, as well as inconsistencies between Plaintiff's statements and her activities of daily living or travel, which the ALJ is directed to consider.  20 C.F.R. §§ 404.1529; 416.929.  The ALJ's reasons are supported by substantial evidence.

This case illustrates the governing principle for review of disability denials.  Plaintiff's medical and personal history is lengthy and complex.  Her condition and lifestyle have varied over time.  Analysis of the record and appropriate characterization of Plaintiff's impairments and capacities is neither clear cut nor beyond reasonable disagreement.  The conclusions reached by the ALJ are not the only ones that could reasonably drawn from this record.  Yet, it is the ALJ's determination of the significant issues that controls.

### B.  Hypothetical Questions

Plaintiff contends the ALJ erred in determining that Plaintiff has the RFC to perform sedentary work and in proposing limitations in the hypothetical to the VE.  R. 27.  Plaintiff contends that the ALJ's finding that Plaintiff could perform other work in the national economy, based on the vocational expert's testimony, was not supported by substantial evidence and Plaintiff should have

-13-

been found disabled.  The Commissioner contends that the ALJ included the appropriate limitations and properly relied on the testimony of the Vocational Expert (VE).

Residual functional capacity is an assessment based on all relevant evidence of a claimant's remaining ability to do work despite her impairments.  20 C.F.R. § 404.1545(a); *Lewis v. Callahan*, 125 F.3d 1436,1440 (11th Cir. 1997).  In determining whether a claimant's physical and mental impairments are sufficiently severe, the ALJ must consider the combined effect of all of the claimant's impairments, and must consider any medically severe combination of impairments throughout the disability determination process.  42 U.S.C. § 423(d)(2)(B).  The ALJ must evaluate a disability claimant as a whole person, and not in the abstract as having severe hypothetical and isolated illnesses.  *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993).  Accordingly, the ALJ must make specific and well-articulated findings as to the effect of the combination of impairments when determining whether an individual is disabled.  *Id.*, 985 F.2d at 534.

The case law in this circuit requires that the ALJ employ hypothetical questions which are accurate and supportable on the record and which include all limitations or restrictions of the particular claimant.  *Pendley v. Heckler*, 767 F.2d 1561 (11th Cir. 1985).  Where the hypothetical employed with the vocational expert does not fully assume all of a claimant's limitations, the decision of the ALJ, based significantly on the expert testimony, is unsupported by substantial evidence.  *Id.* at 1561 (quoting *Brenam v. Harris*, 621 F.2d 688, 690 (5th Cir. 1980)).

The ALJ proposed the following limitations in the hypothetical to the VE:

I want you to assume we have an individual who is 44 years of age, has one year of college with the past relevant work as described by claimant. . . . I'm going to assume this individual can lift ten pounds occasionally, less than ten pounds frequently, stand and walk for two hours of an eight-hour day, sit for six hours of an eight-hour day, can occasionally climb ramps and stairs, stoop, kneel, crouch, crawl, should never climb

> ladders, ropes, scaffold or balance, and avoid extreme cold and heat as well as hazards.
> . . . [W]ould such an individual be able to perform any of her past relevant work or
> other work? . . . And if I add to that that she can perform simple tasks and interact
> appropriately in a structured setting, would she be able to perform the past relevant
> work or other work?

R. 613. The VE clarified: "We're assuming that she can't perform anything more than simple tasks?"

R. 614. The ALJ answered, "In this hypothetical, yes." R. 614. The VE opined that those limitations

would eliminate Plaintiff's past relevant work, but she could do other work that would be semi-skilled

or less in the economy with those restrictions. R. 614. Examples the VE provided were: unskilled

non-precisional electronic assembly, or lower-level semi-skilled sedentary such as a telephone

answering service person and security (non-emergency) monitor or dispatcher. R. 614-15.

Plaintiff contends that the ALJ failed to include Plaintiff's manipulation and gripping

limitations and her fatigue in determining her RFC and in posing hypothetical questions to the

vocational expert. Plaintiff argues that she is incapable of performing sedentary work which requires

the ability to perform nonexertional tasks, such as repetitive fingering, handling, and feeling and the

ability to persist and perform work on a regular and continuing basis for an eight-hour day, five days

per week. Plaintiff argues that the ALJ's hypothetical question posed to the VE was erroneous

because it failed to include these limitations. To support her argument, Plaintiff relies on the report

of the consultative examination of Dr. Yerushalmi, who noted Plaintiff's self-reports that "she can't

lift or carry and can't cut meat" and concluded "her health is her primary barrier to employment and

there is little likelihood that she will return to work until her health issues are resolved." R. 200-201.

As the Commissioner appropriately argues, no physician imposed any manipulative

limitations, and Dr. Yerushalmi, while qualified as a psychologist to opine on Plaintiff's depression,

was not qualified to make a consulting diagnosis on her physical abilities or manipulative limitations. He merely included Plaintiff's self-report statements of her physical condition in his report.

Plaintiff also argues that her medical records are full of complaints to her doctors about pain, numbness and weakness in her wrists and arms, such as that she drops objects; her wrists ache when she tries to type or write; and that she has difficulty driving because of wrist pain when she turns the steering wheel; medical examinations have noted tenderness to palpation over her wrists bilaterally and over her shoulder joints.  However, all of Plaintiff's citations are to records from 2002, when her lupus diagnosis and treatment was still being worked out or are from self-reports of her symptoms, contradicted by subsequent medical records.  *See* Doc. No. 13 at 24, citing R. 78 (Plaintiff's questionnaire); 109 & 112 (February 2002); 244 (April 2002); 358 (April 2002); 400 (August 2002), 602 (Plaintiff's testimony); complaints of fatigue "stated above."[5]

While Plaintiff's complaints of pain in her joints is documented from 2002 and early 2003 in records of her treating physicians, in subsequent records from July 2003 to July 2004, Dr. Buchoff consistently indicated that Plaintiff's joint pain was "mild" or "moderate" and "generalized with occasional exacerbation" and her lupus was "fairly well controlled." R. 397, 533-34, 536. Even when Plaintiff's pain was mentioned as increased, "worse in wrists and neck," it was as a result of modifications to steroid and medications dosages (in 2002) that ultimately were stabilized. *See* R. 398-401; *see also* R. 535, 537 (prescribing weight bearing exercises, including walking or using a treadmill).  The consultative examination and objective testing and observations by physicians  noted no problems with Plaintiff's grip, such as Dr. Ranganathan's report that Plaintiff's hand grip was 5/5,

---

[5]The Court also discussed above the ALJ's discrediting of Plaintiff's complaints of disabling fatigue.

equal bilaterally, her gross/fine manipulation was well preserved, her motor system strength was 4/5 and equal bilaterally, and her touch sensation was intact and equal on both sides with no manipulative limitations.  R. 196.  The ALJ's omission of manipulative or grasping limitations was based on substantial evidence.

The ALJ based the limitations proposed in the hypothetical to the VE on substantial evidence.

### IV.  CONCLUSION

The record in this case shows that Plaintiff does not enjoy full health and that her lifestyle and activities are affected by her ailments to some considerable degree.  The ALJ appropriately considered these circumstances and analyzed them in relation to the exacting disability standard under the Social Security Act.  For the reasons set forth above, the ALJ's decision is consistent with the requirements of law and is supported by substantial evidence.   Accordingly, the Court **AFFIRMS** the Commissioner's decision pursuant to sentence four of 42 U.S.C. § 405(g).  The Clerk of the Court is directed to enter judgment consistent with this opinion and, thereafter, to close the file.

**DONE** and **ORDERED** in Orlando, Florida on September 25, 2006.

*David A. Baker*

DAVID A. BAKER
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Counsel of Record